## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:10-cr-40 |
| | ) | |
| WILLIE B. HARRIS, SR., | ) | JUDGE KIM R. GIBSON |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

### I. INTRODUCTION

This matter comes before the Court on Defendant's Motion to Produce Evidence (Doc. No. 104), Defendant's Motion for *Starks* Hearing, to Produce Material Witness, and to Suppress Audio Recordings (Doc. Nos. 105, 106), and Defendant's Motion to Suppress Evidence and Statements and Request for a *Franks* Hearing (Doc. No. 110). The Government opposes the motions. For the reasons below, the Court will **DENY** the motions.

### II. BACKGROUND

On November 16, 2010, Defendant was indicted on five counts of distribution of cocaine and possession with intent to distribute cocaine. (Doc. No. 1). The Indictment charges that on separate occasions from about January 12, 2010 to June 21, 2010, in the Western District of Pennsylvania, Defendant unlawfully distributed crack cocaine, and unlawfully possessed with the intent to distribute crack cocaine, in violation of 21 U.S.C. § 841(a) and (b). (Id.).

Defendant subsequently filed these motions in March 2012. Through Defendant's first motion, he seeks to compel the government to disclose any prior criminal acts and/or misconduct by

1

Defendant that it intends to prove at trial. Through Defendant's second motion, he seeks to produce a material witness and suppress related audio recordings once a *Starks* hearing determination is made by the Court. Through Defendant's third and final motion, he requests the Court to conduct a *Franks* hearing, he seeks to suppress physical evidence recovered after the execution of a search warrant against Defendant, and he seeks to suppress post-arrest statements made to law enforcement officials. The Government filed an omnibus response to these motions (Doc. No. 126) on July 24, 2012, and a hearing was held on August 28, 2012. (See Doc. No. 138). At this hearing, the Government introduced into evidence: (1) the testimony of three witnesses: Detective Kevin Price, Special Agent Arnold Bernard, and Detective Tom Keirn; three exhibits, including an application for search warrant and authorization, a Cambria County Drug Task Force Rights Form signed by Defendant, and a declaration of cooperation by Defendant with the Cambria County Drug Task Force (See Doc. No. 140 at 19-33). Defendant cross-examined the Government's witnesses, and introduced several exhibits into evidence, including supplemental reports from the Cambria Country Drug Task Force, a voluntary statement from the confidential informant ("CI") from the Cambria County Drug Task Force, a search warrant prep report, a criminal history report of the CI, and work reports from the Cambria County Drug Task Force (See id. at 1-18). In April, 2013, the parties filed their Proposed Findings of Fact and Conclusions of Law (Doc. Nos. 168, 169, and 171). The matter is now ripe for the Court's consideration.

## III.    FINDINGS OF FACT

The Court makes the following findings of fact based on the evidence and testimony presented at the August 28, 2012 suppression hearing.

1. In January of 2010, Detective Kevin Price, a county detective of the Cambria County District Attorney's Office and field supervisor of the Cambria County Drug Task Force ("Task Force"), first contacted Dorothy King after she had left a message on the Task Force phone hotline. (Doc. No. 138 at 39-40).

2. Detective Price returned Ms. King's call and she relayed to Detective Price that she was aware of information related to drug trafficking in the Hornerstown section of Johnstown, Cambria County, and this information prompted Detective Price to meet with Ms. King in person. (Id. at 40-41).

3. At this meeting on January 8, 2010, Ms. King identified someone from whom she had bought drugs—including crack cocaine—in the past, as "Will," and identified him by both his address on Ash Street and an official photo of Mr. Harris shown to her by Detective Price. (Id. at 41-42).

4. This meeting was the first time Detective Price had ever met Ms. King, but he recalled her having told him during this meeting that she had, "cooperated in the past," with the Task Force. (Id. at 88).

5. Prior to his meeting with Ms. King, Detective Price had personal knowledge, "that Willie Harris was involved in illegal drug trafficking," in Cambria County. (Id. at 39).

6. Detective Price also gleaned from Ms. King that she had bought crack from Mr. Harris during the prior week, and that in general, "she does not use CRACK but people do come to her to find CRACK and that is how she pays her bills," which was a practice "common," among those lower on the "ladder," in the drug world. (Doc. No. 140 at 2; Doc. No. 138 at 42, 45, 106).

3

7. After his discussion with Ms. King, Detective Price decided he would employ her as a paid confidential informant ("CI"). (Doc. No. 138 at 46, 126-28).

8. Subsequent to their initial meeting, the CI conducted three controlled buys for the Task Force on three separate dates: January 12, 2010; January 21, 2010; and June 10, 2010. (Id. at 46, 52, 56).

9. During the January 10, 2010 controlled buy, the Task Force employed the CI—under surveillance, using official "buy money," and subject to strip searches before and after the buy (collectively, "controls")—to meet Mr. Harris at his 635 Ash Street residence, where he permitted the CI to enter his home after meeting her on the porch. Upon exiting the house, the CI met handed over to the Task Force 1.31 grams of crack cocaine. (Id. at 48-53).

10. During the January 21, 2010 controlled buy—subject to the same controls as the January 10, 2010 buy[1]—the CI approached Mr. Harris outside of his residence near his vehicle, and then placed the official buy money in the trunk, at which point Mr. Harris entered his Ash Street residence, then came back out with Craig Berry[2], who then walked down the street, dropped something on the sidewalk, and returned towards the Ash Street residence. The CI, having followed Mr. Berry, picked up what he had dropped—5.7 grams of crack—and then turned this over to law enforcement. (Id. at 53-56).

---

[1] Audio was also incorporated as a control during this buy. (See Doc. No. 138 at 53).

[2] Craig Berry was also indicted on one count of cocaine distribution (Doc. No. 1), and ultimately entered a change of plea from not guilty to guilty to Count Two of the Indictment. (Doc. No. 47). Defendant Berry was subsequently sentenced by this Court for a term of 60 months of imprisonment on July 5, 2011. (Doc. No. 76). Defendant Berry later moved for a sentence reduction to 37 months of imprisonment under 18 U.S.C. 3582(c), and in accordance with the Fair Sentencing Act of August 3, 2010, the Government granted his motion on August 24, 2012 (Doc. No. 134).

11. During the June 10, 2010 controlled buy, again subject to the same controls[3], the CI met Mr. Harris at his Ash Street residence, and the two of them got into his blue mini-van, drove to the Moxham section of Johnstown to 423 Coleman Avenue. Mr. Harris exited the vehicle, went inside briefly, and then returned to the car, where the CI was waiting, and they then returned together to the Ash Street residence. (Id. at 56-60).

12. During this final controlled buy, before the CI returned to the law enforcement present at the scene, but after exiting the van, she approached a nearby stone wall, where she was observed to have bent over immediately prior to being picked up by the Task Force. Upon suspicion of her activity, officers checked the stone wall and later verified through her own written statement, that she placed a portion of the crack that had been given to her by Mr. Harris in the wall so that she could retrieve it later and subsequently sell it. (Id. at 60-63).

13. Immediately following this attempt to "rip off" the Task Force, Ms. King was terminated as a CI. (Id. at 62).

14. Under these facts, an application for a search warrant was prepared on June 11, 2010 by Detective Price for 635 Ash Street, 423 Coleman Avenue, a 1999 white Cadillac, and a 2001 bluish Ford mini-van. (Government's Exhibit 1). Attached to the application was an affidavit of probable cause, also prepared by Detective Price, detailing the circumstances behind the controlled buys. (Id.).

15. Prior to submitting the application for a search warrant, Detective Price presented the application and affidavit to Assistant District Attorney (ADA) Leiden for his approval—a routine procedure in all applications for a search warrant. (Doc. No. 138 at 68). They then

---

[3] No audio was used as a control for this buy. (See Doc. No. 138 at 57).

discussed and reviewed various details concerning the application, including the CI's attempt to "rip off," the Task Force by hiding a portion of the controlled substances at the stone wall. (Id. at 70-71). ADA Leiden instructed Detective Price not to include this information[4] in the affidavit because they, "had enough, as far as the probable cause," and thereafter ADA Leiden signed the application. (Id. at 71).

16. The application was presented for review to Judge Patrick Kiniry of the Cambria Court of Common Pleas on June 11, 2010, and he subsequently approved and signed the search warrant, finding probable cause for it to be executed, starting on June 11, 2010 at 10:05 a.m. and expiring on June 13, 2010. (Id. at 76-77, 84).

17. Following the issuance of the search warrant on June 11, 2010, law enforcement—including Detective Price—executed the warrant at Mr. Harris' residence at 635 Ash Street. (Id. at 78).

18. Advising Mr. Harris of his *Miranda* rights, Detective Price informed him that they had a search warrant for his residence and blue mini-van, and an arrest warrant for him. (Id.).

19. A search of the Ash Street residence revealed a quantity of crack cocaine; a pat-down search of Mr. Harris revealed a sum of cash in the amount of $2,149 that included some of the control money from the June 10, 2010 buy, and some pills contained in a pillbox; and a subsequent inventory search of the blue mini-van yielded additional crack cocaine, packaged in a plastic bag. (Id. at 80-83).

20. Mr. Harris was arrested around 2 p.m. in the afternoon and then transferred to the Richland Township Police Department for processing. (Id. at 80, 138).

---

[4] Other details not present in the affidavit included Ms. King's use of crack cocaine to pay bills, her criminal history, the fact that she was being paid as a CI, and her termination after the incident at the stone wall. Testimony by Detective Price revealed that these types of details are not routinely included in the affidavit of probable cause. (See Doc. No. 138 at 130-31).

21. Around 5 p.m. that same afternoon, Mr. Harris met with and was interviewed by Special Agent Arnold Bernard of the Federal Bureau of Investigation (FBI) and Detective Tom Owens of the Johnstown Police Department at the Richland Township Police Department. (Id. at 136, 138-39, 144).

22. Special Agent Bernard advised Mr. Harris of his *Miranda* rights both verbally and in writing, by having him fill out and sign a Cambria County Drug Task Force rights form (Government Exhibit 2; Doc. No 138 at 138-39, 144). Acknowledging these rights, Mr. Harris voluntarily cooperated during the interview by providing details about how he had acquired crack cocaine. (Id. at 138-140).

23. The interview lasted about an hour, and was described as "cordial [and] compliant," with "[n]othing out of the ordinary," occurring, and Mr. Harris being, "coherent," during this time and not appearing to be under the influence of alcohol or drugs. (Id. at 141).

24. Following this interview, Mr. Harris was transferred to Magistrate Varner's office, where he met with Detective Tom Keirn of the Richland Township Police Department in an interview room within the magistrate's office. (Id. at 151-52, 156).

25. At this meeting, Detective Keirn testified that he asked Mr. Harris whether he had been advised of his Constitutional rights and that Mr. Harris agreed that he had indeed been advised of these. (Id. at 152). Detective Keirn testified that he, "did not re-read him his Miranda warnings. [He] just confirmed that he understood what he had already been given." (Id. at 157).

26. After this, Mr. Harris agreed to give Detective Keirn a written statement of the verbal statements that he provided to Special Agent Bernard and Detective Owens, and

7

subsequently supplied such a written statement (Government Exhibit 3; see also Doc. No. 138 at 152-53).

27. The meeting between Mr. Harris and Detective Keirn lasted about twenty minutes, during which Mr. Harris appeared coherent and did not appear to be under the influence of alcohol or drugs. (Id. at 154, 159).

28. Mr. Harris was ultimately indicted on five counts of distribution of cocaine and possession with intent to distribute cocaine on November 16, 2010. (Doc. No. 1).

## IV. CONCLUSIONS OF LAW

The Court will address each of Defendant's motions in turn.

### A. Motion to Produce Evidence

Defendant requests the Court, pursuant to Federal Rules of Evidence 404(b) and 609, to compel the Government to provide him with a statement describing the criminal offenses or acts of misconduct, other than those specified in the Indictment, that the Government intends to prove at trial. (Doc. No. 104 at 1). The Court's Amended Pretrial Order requires the Government to produce such evidence of uncharged conduct on or before May 13, 2013. (Doc. No. 160 at 3). The Government indicates that it does not currently intend to introduce such evidence, but will comply with the Court's order should its intentions change. (Doc. No. 126 at 1-2). Accordingly, the Court will **DENY** Defendant's motion without prejudice and grant Defendant leave to file an appropriate motion if the Government ultimately fails to comply with the Court's pretrial order.

## B.    Motion for *Starks* Hearing

Defendant requests the Court, pursuant to *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975), to produce a material witness, and to suppress audio recordings, in order to demonstrate that the Government has not established that the CI in this case voluntarily consented to the recording of conversations with Defendant. (See Doc. No. 106 at 10). In order to admit an audio recording into evidence, the Court in *Starks* identified seven factors that must be established as the foundation for admissibility. *Starks*, 515 F.2d at 121 n.11. Such an evidentiary showing, however, is required only when the Defendant has sufficiently made a, "colorable attack … as to a tape's authenticity and accuracy." *Id.* at 122. Here, upon Defendant's request for a *Starks* hearing, the Court held a preliminary hearing to determine whether there was sufficient evidence to make such a colorable attack. (See Doc. No. 138 at 3-11). After consideration of the parties' arguments over whether to grant a *Starks* hearing, the Court found that Defendant had "not established a colorable attack on the tape's authenticity or accuracy," and, in turn, Defendant had "not presented a sufficient reason for the *Starks* hearing," and as such, it was **DENIED**.[5] For these foregoing reasons, Defendant's motion for suppression of the audio recording is **DENIED**.

## C.    Motion to Suppress Evidence and Statements

Defendant's final motion (Doc. No. 110) asserts four arguments as to why the recovered evidence and statements made after his arrest should be suppressed. Specifically, Mr. Harris

---

[5] The Court's reasoning was that because Defendant only demonstrated, "that the CI has a criminal background and speculates that the CI was threatened with prosecution to obtain her cooperation, or was offered various inducements," this did not rise to the level of sufficiency necessary for a *Starks* hearing. (Doc. No. 138 at 11).

requests that a *Franks* hearing be held in order for him to establish that the affidavit of probable cause used for the search warrant contained material omissions, in violation of the Supreme Court's ruling in *Franks*, and thus requiring the evidence to be suppressed here. Separately, Mr. Harris argues that the affidavit lacked sufficient probable cause in order to obtain a valid search warrant, and as a product of the defective warrant, the recovered evidence should be suppressed. Thirdly, Mr. Harris argues that, in the event the Court does indeed suppress the evidence because of the lack of probable cause, the Court also should find that the good faith exception—that would allow admission of the evidence—does not apply in this case. And finally, Mr. Harris argues that his post-arrest verbal and written statements should be suppressed because they were made involuntarily, in violation of his Fifth and Sixth Amendment rights. The Government opposes each request. The Court will address each issue in turn.

## 1. Material Omissions in the Affidavit of Probable Cause in Violation of *Franks*

Defendant first argues that evidence recovered from his home and vehicle should be suppressed because the affidavit of probable cause used for the applicable search warrant contained material omissions in violation of *Franks v. Delaware*. (See Doc. Nos. 110 at 12-16; 168 at 16-16-26). In order to demonstrate this, Defendant must first request a *Franks* hearing, which is required, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and … the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56, (1978). Prior to the hearing held in this matter, Defendant

10

requested a *Franks* hearing on the basis of a preliminary showing of, "the material misstatements and omissions in the affidavit." (Doc. No. 100 at 16). While the Government opposed this request because, "defendant ha[d] failed to substantiate his entitlement to a <u>Franks</u> hearing," the Court nonetheless granted the hearing.[6] (Doc. No. 126 at 19). In light of this decision, and for the reasons that follow, the Court will **DENY** defendant's motion to suppress subsequently obtained evidence on the basis of *Franks*.

Defendant argues that the *Franks* hearing made clear that "there was ample evidence ... which demonstrated several material omissions and one obvious misrepresentation." (Doc. No. 168 at 18). The Government contends that, "despite being granted a <u>Franks</u> hearing, none of these omissions were made by Detective Price intentionally or with reckless disregard for the truth, <u>and</u> none were material to the probable cause determination ...." (Doc. No. 171 at 13). Under the Fourth Amendment to the United States Constitution, the Warrant Clause provides that, "no warrants shall issue but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. In *Franks*, the Court found that a defendant has the right to challenge the veracity of the statements made in the affidavit of probable cause used to secure the warrant. The Court there held:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the

---

[6] Although the Court allowed defendant to proceed with the *Franks* hearing, it notes that its decision to allow the hearing was a close one because the preliminary showing by Defendant, while substantial, did not purport to show, "direct evidence of the fact that these [omissions from the affidavit] were knowingly or intentionally omitted or [made] with reckless disregard of the truth ..." (Doc. No. 138 at 33). The Court, however, wanted the evidence to be admitted in order to allow defendant a fair opportunity to be heard on the issue.

evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks*, 438 U.S. at 155-56. Thus, in order for an affidavit of probable cause to be sufficiently deficient under this basis, two requirements are necessary: first, the false statement must be made knowingly and intentionally, or with reckless disregard for the truth; and second, the false statement or omission must be necessary to the finding of probable cause for the warrant. Where omissions or misstatements made with reckless disregard for the truth are asserted as the basis of deficiency, the Third Circuit has found, "that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting. *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000). With this in mind, this Circuit has found that, "the defendant must ultimately prove by a preponderance of the evidence that: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination. *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006).

In the case *sub judice*, Defendant alleges that there are six omissions and one misstatement that provide a sufficient basis for finding a lack of probable cause in the affidavit. Specifically, these omissions include: 1) that the CI herself had sold drugs; 2) the CI's criminal history; 3) that Detective Price met the CI for the first time on January 8, 2010; 4) the CI was a paid informant; 5) the incident with the CI at the stone wall after the controlled buy from Defendant on June 10, 2010;

12

and 6) that the CI was terminated as an informant after the June 10, 2010 controlled buy. (See Doc. No. 168 at 18-22). Additionally, Defendant alleges that the affidavit contained a misstatement in that included a statement that the CI had provided *reliable* information to Detective Price *in the past*. (See id. at 22-25). The Court will first assess Defendant's alleged omissions and whether 1) they were made either knowingly and intentionally, or with reckless disregard for the truth and 2) whether these omissions were material, or necessary, for a finding of probable cause made by Judge Kiniry. The Court will then conduct a similar analysis with regard to Defendant's alleged misstatement in the affidavit of probable cause.

As for the alleged omissions, Defendant first avers that the affidavit did not contain information that the CI was an "admitted drug dealer." Specifically, Defendant argues that the affidavit omitted that the CI *sold* drugs on the basis of Detective Price's supplemental report (Defendant's Exhibit A) that indicated, "KING stated she does not use CRACK but people do come to her to find the CRACK and that is how she pays her bills." (Doc. No. 140 at 2). The information contained in the affidavit in paragraph 4 indicates, however, "that C1 [King] has purchased CRACK COCAINE from a person identified as Willie HARRIS. C1 stated that C1 has purchased CRACK COCAINE in the mid to late 2009 into January 2010." (Id. at 23). While the precise language contained in the report does not match that of the affidavit, the issue here is whether this actually constituted an omission, and if so, whether this was done knowingly and intentionally or with reckless disregard for the truth.

Detective Price's supplemental report does not contain specific language of the CI "selling" drugs, but rather that she had purchased drugs from Mr. Harris. Despite this, during the suppression

13

hearing, Defendant's counsel asked Detective Price that, "you'll agree with me that this report says that she admitted to you that she sold drugs, correct," to which Detective Price answered, "correct." (Doc. No. 138 at 106). Defendant thus argues that the language of the report would indicate that the CI sold drugs, whereas the language of the affidavit merely indicates that she bought drugs, and is therefore an omission even though the precise language of "selling" drugs was not used in the report. While this may technically constitute an "omission," the fact remains that the affidavit contains information that the CI was involved in the drug world, and that she was well acquainted with purchasing drugs, and in this instance, buying drugs from Mr. Harris. The omission of the notion that the CI was not only a buyer, but also a seller, is not fatal to the determination of probable cause on a *Franks* basis because such information merely adds to underlying circumstances highlighting Defendant's criminal network with regard to possession and distribution of cocaine. If this information regarding the CI's own connections to the drug world had been part of the affidavit, it does not necessarily undercut the facts that the CI was supplied with drugs by Mr. Harris. The information concerning where and how the controlled substances were obtained from Mr. Harris would be unchanged by the fact that the CI herself had used crack to "pay her bills."

Even further, Defendant has not established that this omission was committed knowingly and intentionally, or with reckless disregard for the truth. In fact, the inclusion in the affidavit that the CI had purchased drugs from Mr. Harris in the past suggests that Detective Price included the necessary information from his report and interview of the CI to establish the predicate facts of where and how Mr. Harris sold controlled substances. Thus, for these reasons, the Court finds that while the information regarding the "selling" of drugs by the CI may technically be an omission in the affidavit of probable cause, it was neither done knowingly or intentionally, or with reckless disregard

14

for the truth, nor was it material to the determination of probable cause in this case.

Similarly, Defendant's second alleged omission—the criminal history of the CI—does not rise to the level of information that was necessarily omitted knowingly and intentionally, or with reckless disregard for the truth, nor is it material to the determination of probable cause with regard to Mr. Harris in light of the other information contained in the affidavit. Defendant contends that Ms. King's previous arrests and convictions that were known by Detective Price after he conducted a background check on her in January of 2010 were not contained in the affidavit of probable cause and should serve as a basis for suppression. This information, however, known to Detective Price—the author of the affidavit—and to Assistant District Attorney (ADA) Tom Leiden, was information that Detective Price did not include because he, "never put[s] a CI's criminal history in [his] probable cause [affidavit]." (Doc. No. 138 at 131). Thus, while this information was kept out, it was not done so with reckless disregard for the truth of the facts because such CI criminal history information is routinely kept out of the affidavit by practice. Even further, Defendant fails to assert why this information was necessary in order to make a determination of probable cause that the controlled substances would be found at Mr. Harris' residence or in his mini-van. While inclusion of such information might only seem to support the proposition that the CI, with a past criminal record, would have insight into the illegal activities of Mr. Harris—a former convicted felon himself; such exclusion of Ms. King's criminal history does nothing to undercut the force of the other information contained within the affidavit. Thus, the omission of this information is not material for the purposes of a *Franks* determination, and therefore cannot serve as a basis for suppression.

Defendant next contends that the affidavit omits the fact that the CI never worked for

15

Detective Price or the Cambria County Drug Task Force, "in the past," despite the affidavit containing information that the CI, "has provided reliable information to this AFFIANT and the Cambria County Drug Task Force in the past."[7] (Doc. No. 140 at 23). Defendant argues that the affidavit omits the fact that upon his testimony, Detective Price admitted, "he never met Ms. King prior to January 8, 2010 ...." (Doc. No. 168 at 19). Detective Price met Ms. King for the first time on January 8, 2010. At this meeting, Ms. King provided information to Detective Price regarding Mr. Harris' activities in "selling a lot of CRACK COCAINE," and that Defendant "is a big time dealer." (Doc. No. 140 at 1). The first controlled buy occurred on January 12, 2010, whereby the CI—Ms. King—successfully bought an amount of crack from Mr. Harris inside his Ash Street residence, conducted under police-supervised implemented controls. A second successful controlled buy from Mr. Harris through the CI (Ms. King) occurred on January 21, 2010, which was about two weeks after Ms. King initially provided Detective Price with information that Mr. Harris sold drugs from his Ash Street residence. And a third controlled buy occurred on June 10, 2010, in which another amount of crack was obtained from Mr. Harris. On June 11, 2010, Detective Price authored and signed the affidavit of probable cause that contained the information: "CI [Ms. King] has provided reliable information to this AFFIANT and the Cambria County Drug Task Force in the past." (Doc. No. 140 at 23). From the perspective of writing the affidavit on June 11, 2010 and looking to the information provided by the CI to Detective Price at their initial meeting on January 8, 2010, the use of the phrase, "in the past," was accurate because the information obtained on January 8, 2010 led to three controlled buys from Mr. Harris, making the information sufficiently reliable.

---

[7] Defendant also asserts this omission as an "affirmative misrepresentation," in a subsequent section of his analysis of the *Franks* hearing. As stated here, however, the Court's analysis serves to dismiss this contention for purposes of the *Franks* analysis on both bases—as either an omission or misrepresentation.

For these reasons, the Court does not consider this to be an omission since Detective Price's statement made on June 11, 2010 were in contemplation of the reliable information the CI had provided to him six months prior. Therefore, this cannot serve as a *Franks* basis for suppression purposes.

Defendant also argues that the affidavit omitted the fact that the CI was a paid informant, and that she, "was paid following each 'controlled buy.' " (Doc. No. 168 at 20). Defendant, however, neither attempts to argue that this omission was done intentionally or with reckless disregard for the truth, nor does he even attempt to address why such information would be material to a determination of probable cause in this case. Indeed, in testimony before this Court, Detective Price indicated that it was usual practice not to put such information into the affidavit of probable cause. In response to Defense Counsel's inquiry of whether he included the information that the CI had been paid into the affidavit, Detective Price said, "[n]o, I did not discuss that. I've never put a CI being paid in my affidavit." (Doc. 138 at 130). While the CI was provided some form of payment after each controlled buy, the inclusion of such information in the affidavit would not alter the determination to grant the search warrant, because the necessary information—that Mr. Harris was selling drugs at his residence on three separate occasions in which this CI was used—was already spelled out within the affidavit. Additionally, Detective Price's and ADA Leiden's decision to not include this information, a practice routinely used in the past with similar affidavits, was not made here with purposeful or reckless disregard because all the material information was contained therein and such additional information was not necessary because probable cause was already established through the included information. The inclusion of this additional information would not affect the probable cause determination. The Court does not find this ground a persuasive *Franks* basis for

suppression in this case.

Defendant contends that the most glaring omission was the incident that occurred during the third and final controlled buy, when the CI is claimed to have attempted to "rip off," the Task Force. The facts surrounding this incident are not nearly as important as the procedural steps taken to ensure that what happened was not only documented, but made known to ADA Leiden prior to acquiring the search warrant. During this incident, the CI is claimed to have hidden away some of the crack she bought from Mr. Harris in a stone wall near her rendezvous point with the Task Force. At first, the CI did not claim responsibility for the incident, but after being pressed by law enforcement officers, she "admitted that [she] placed the bag of CRACK COCAINE in the wall so [she] could sell it later to make some money because she owed [her] father money." (Doc. No. 140 at 6). This information was provided in the Detective's Supplemental Report for the June 10, 2010 controlled buy (Defendant's Exhibit B), but was not set forth in the affidavit of probable cause. Defendant contends that this omission was made knowingly and intentionally by Detective Price. The facts indicate that Detective Price did have intimate knowledge of these events and did advise ADA Leiden of what happened. Indeed, Detective Price testified that he "told Leiden exactly what happened the day before," and that he knew that this information was not contained with the affidavit. (Doc. No. 138 at 130). Even further, while this information may not have appeared in the affidavit, it was nonetheless documented in the supplemental report authored by Detective Price and in Ms. King's voluntary written statement made for the Task Force.

While the issue of whether this information was knowingly and intentionally omitted is a close one here, the Court considers the issue of materiality to be more dispositive on this omission.

18

To make this determination, the Court asks whether this information was absolutely necessary to making a finding of probable cause such that inclusion of such information would have led Judge Kiniry to disallow the search warrant in this case. The fact that the CI supposedly attempted to "rip off" the Task Force would seemingly call into question her trustworthiness; however, the determination of probable cause in this case is relative to Mr. Harris and not the CI. In other words, in order for Defendant to show that this omission is material for the *Franks* hearing purposes, he must be able to show how the CI's questionable character for trustworthiness impacts the likelihood that Mr. Harris was the one who was selling drugs and was doing it out of his residence and mini-van. Under the facts here, the Task Force ensured that each buy was conducted under controlled circumstances, whereby the CI was strip searched prior to and after the buy. The fact that the CI may have attempted to hide some of the crack in the stone wall after the meeting with Mr. Harris does little to impinge upon the likelihood that the crack originated from Mr. Harris. Yes, this incident may call into question the CI's character, but its omission from the affidavit lacks the bite against probable cause for which the Defendant argues. Even further, the Task Force's decision to terminate the CI immediately following this incident cuts against any accusations of nefarious intentions or purposeful decisions by Detective Price to omit such information in the affidavit. Thus, for the foregoing reasons, the Court concludes that this omission does not serve as a basis for suppression of evidence in this case.

Lastly, Defendant contends that the, "final deep-impact omission," concerns the CI's termination following the June 10, 2010 controlled buy. (Doc. No. 168 at 21). While Defendant does not specifically spell out why this information was intentionally left out and why it was necessary to the probable cause determination, it would seem the premise is similar to the alleged

19

material omissions stated above: namely, that Detective Price knew this information, and kept it out of the affidavit because it would have persuaded Judge Kiniry from making a determination that the controlled substances would likely be found at Mr. Harris' residence or in his mini-van. Again, for the same reasons as articulated by the Court above, there is no indication that Detective Price purposefully omitted this information or did so with reckless disregard for the truth. All that Defendant has shown is that Detective Price knew this information, documented it in his reports, and did not include it in the affidavit. Any insinuations beyond these facts do not suffice for finding that the omission was done knowingly and intentionally or with reckless disregard for the truth. Additionally, Defendant once again fails to demonstrate precisely why this information would have dissuaded Judge Kiniry from making a finding of probable cause indicating the place and circumstances of finding the controlled substances relative to Mr. Harris. The fact that the CI was terminated does not impact the alleged facts in the affidavit that Mr. Harris sold crack to the CI on three separate occasions, and that these sales occurred either inside his residence, immediately outside the Ash Street residence, or in Mr. Harris' mini-van. The Court finds that the information surrounding the termination of the CI was not necessary to a finding of probable cause for a search warrant in this case, and thus, the materiality prong of the *Franks* analysis is not satisfied. For these reasons, and those set out above, the Court will deny Defendant's motion to suppress evidence based on the alleged material omissions and misrepresentations under the *Franks* analysis.

## 2. Sufficiency of Affidavit of Probable Cause for Search Warrant

Defendant also avers that the evidence recovered from 635 Ash Street and the 2001 Ford Van should be suppressed because the affidavit of probable cause failed to establish sufficient probable

cause for a search warrant. (See Doc. Nos. 110 at 6-12; 168 at 26-32). Specifically, Defendant argues that the affidavit fails to set forth probable cause and that the information contained in the affidavit was stale.[8] (See Doc. Nos. 110 at 6-12; 168 at 26-32). The Government disagrees and argues that the there was sufficient probable cause to give the Judge a basis for issuing the warrant for the home and the vehicle. (See Doc. Nos. 126 at 13; 171 at 20). Additionally, the Government contends that Defendant's staleness argument is mooted by the fact that case law allows judges to infer criminal activity at a drug trafficker's residence. (See Doc. Nos. 126 at 16; 171 at 23).

The Fourth Amendment to the United States Constitution guarantees that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. "Ordinarily, 'for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause.' " *United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). A magistrate judge may find probable cause for the issuance of a search warrant when, upon consideration of the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The magistrate's determination that probable cause existed is to be, "paid great deference." *Id.* at

---

[8] As to Defendant's staleness argument, he contends that because the "only information contained in the affidavit of probable cause which is indicative of the purchase of cocaine base inside 635 Ash Street, was the sole allegation that the CI had purchased 1.31 grams of crack from Mr. Harris inside this residence," had occurred six months prior to the execution of the affidavit, the warrant, "was deficient on its face as it contained stale information." (Doc. No. 168 at 27-28, 29).

21

236 (quotation omitted). Thus, "[a] reviewing court must determine only that the magistrate had a 'substantial basis' for concluding that probable cause existed to uphold the warrant." *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir.) (quoting *Gates* 462, U.S. at 238); see also *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993) (instructing reviewing courts to, "keep[] in mind that the task of the issuing magistrate is simply to determine whether there is a fair probability that contraband or evidence of a crime will be found in a particular place, a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found."). In arriving at its determination, the reviewing court may consider only, " 'the facts that were before the magistrate, *i.e.*, the affidavit, and [may] not consider information from other portions of the record.' " *United States v. Mikevich*, 638 F.3d 178, 182 (3d Cir. 2011) (quoting *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993). In turn, the affidavit, "must be read in its entirety and in a common sense and nontechnical manner." *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997) (citing *Conley*, 4 F.3d at 1206). "The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated." *United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992).

Here, the affidavit of probable cause considered by Common Pleas Judge Kiniry set forth detailed information relating to the qualifications of the affiant, the criminal history of Defendant, the locations of the places to be searched, and the underlying circumstances justifying the search of those places. Specifically, the affidavit established, among other details, that: (1) the affiant had extensive experience and qualifications with handling narcotics investigations; (2) the common practices and "hallmarks" indicative of drug traffickers and the evidence associated with such drug trafficking; (3) the circumstances surrounding the affiant's initial meeting with the CI and

22

subsequent information relating to Mr. Harris' identification as a drug trafficker; (4) the background information, residence information, and criminal history of Defendant that informed the affiant of Mr. Harris' prior felony conviction for felony drug violations; (5) the details surrounding the Cambria County Drug Task Force's controlled buys of crack from Mr. Harris through the CI, occurring on three separate occasions over the span of six months, and originating at Defendant's 635 Ash Street residence, and culminating either at the residence, within the vicinity of the residence, or in the Defendant's mini-van; and (6) the exact places—the Ash Street residence and the mini-van—where the drug purchases occurred during those three controlled buys. (See Doc. No. 140 at 21-29).

These facts set forth in the affidavit, when viewed by a judge, were sufficient to provide a fair probability that evidence of drug trafficking would be found at Mr. Harris' residence and in the mini-van because the details set forth the exact chronology of events for the drug purchases in those places. The specificity contained in the affidavit was sufficient to identify the residence and the mini-van as the places were the actual buys by the CI occurred. Even if one of the buys occurred outside the residence of Mr. Harris, as happened during the January 21, 2010 controlled buy, this Circuit has found that, "direct evidence linking the residence to criminal activity is not required to establish probable cause." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (noting that "probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested) (citing *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001); *United States v. Whitner*, 219 F.3d 289, 297 (3d Cir. 2000); *Conley*, 4 F.3d at 1207; *Jones*, 994 F.2d at 1056). Thus, the facts indicate here that there was a substantial basis for Judge Kiniry to determine a fair probability existed that evidence of drug

possession and distribution would be found in Defendant's Ash Street residence and/or mini-van. For these reasons, and based upon the totality of the circumstances in this case, the Court finds that there was sufficient probable cause contained in the affidavit to justify the issuing of the search warrant in this case.

With regard to the issue of staleness, the Defendant contends that because the information in the affidavit of probable cause contained details that the only buy that actually occurred *inside* Defendant's house occurred six months prior to the execution of the affidavit, such information was too removed in time, *i.e.*, stale, to reliably serve as a basis for establishing probable cause that evidence of drug trafficking would be found at Mr. Harris' Ash Street residence. (See Doc. No. 110 at 6-7). As noted above, courts have found that probable cause exists for evidence of a crime within one's residence if that person has committed a crime. Here, the facts contained within the affidavit of probable cause allege that after three controlled buys, that were all spatially close to Mr. Harris' residence, provided a sufficient basis to reasonably believe that evidence of his crimes would be found within the residence and mini-van. While the first buy was the only one that actually occurred *inside* the residence, the fact that two other buys, which extended over a temporal distance of about six months,[9] and occurred within a close proximity to the residence, supplied the issuing magistrate with sufficient details that evidence would likely be found with the Ash Street residence, in addition to the mini-van.

Even further, this Circuit has found that a, "defendant's continuous course of conduct in a ... drug operation made it reasonable to conclude that the illegal drug sales would continue." *Costa*, 736

---

[9] The second buy occurred on January 21, 2010 and the third buy occurred on June 10, 2010.

24

F.Supp. 2d 859, 863 (concluding that where a seven month gap existed between the occurrence of the information contained in the affidavit and the presentation of the affidavit to the magistrate judge was an insufficient basis for a finding of staleness). *Id.* Here, the nature of the drug trafficking crime, combined with the evidence of cocaine sought through the affidavit points to a scenario whereby there were ongoing and continuous drug operations by the Defendant that had a nexus originating from his Ash Street residence and extending beyond the home to include his mini-van. Thus, for these reasons, the Court finds that the information contained in the affidavit of probable cause concerning the likelihood that evidence would be found at Mr. Harris residence was not stale. As such, there existed sufficient probable cause to issue the search warrant in this case, and the Defendant's motion to suppress evidence on this basis is denied.

### 3. Good Faith Exception

While the Court has found that there was indeed sufficient probable cause contained in the affidavit, it need not reach the issue of whether the good faith exception applies in this case because the warrant itself was not defective. Despite this, however, the Court will nonetheless engage in a brief analysis of Defendant's argument as if it had suppressed the evidence on the basis of a lack of probable cause in the affidavit. Defendant contends that, in the event that the Court finds the search of his residence and vehicle to be unlawful, the Court should also find that the "good faith" exception does not apply in this case because the warrant was issued in reliance on a deliberately or recklessly false affidavit or because the affidavit was so lacking in probable cause that any officer's belief in it was entirely unreasonable. (See Doc. Nos. 110 at 16-20; 168 at 32-36). The Government disagrees and argues that neither of these exceptions to the good faith exception applies in this case.

(See Doc. Nos. 126 at 22; 171 at 26).

Under the good faith exception rule, even if the magistrate lacked a substantial basis for the issuance of a search warrant, the Court ordinarily should not suppress evidence seized pursuant to the warrant, "when an officer acting with objective good faith has obtained [the] search warrant from a judge or magistrate and acted within its scope." *United States v. Leon*, 468 U.S. 897, 920 (1984). Usually, "[t]he mere existence of a warrant ... suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *United States v. Hodge*, 246 F.3d 301, 307-08 (3d Cir. 2001) (citations omitted). There are, however, four scenarios in which the good faith exception does not apply:

> (1) The magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) the magistrate abandoned his judicial role and failed to perform his neutral and detached function; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*United States v. Stearn*, 597 F.3d at 561 n.19 (internal quotations and citations omitted). "The test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.' " *United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999) (quoting *Leon*, 468 U.S. at 922, n.23). " '[T]he good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all known facts.' " *United States v. Zimmerman*, 277 F.3d 426, 438 (3d Cir. 2002) (quoting *United States v. Reilly,* 76 F.3d 1271, 1273 (2nd Cir.1996)). The "objective standard 'requires officers to have a reasonable knowledge of what the law prohibits.' " *Id.* (quoting *Leon,* 468 U.S. at 919 n. 20). At the same time, we should "neither expect nor require ... 'nonlawyers in

26

the midst ... of a criminal investigation' " to have conducted a "detailed analysis" of the relevant case law. *Stearn,* 597 F.3d at 563 (quoting *United States v. Ventresca,* 380 U.S. 102, 108 (1965)). Under this standard, the Government bears the burden of establishing that the good faith exception applies. *Leon,* 468 U.S. at 924.

Here, the existence of the warrant could be considered to have provided sufficient basis for application of the good faith exception because there were no highly unusual circumstances surrounding the execution of the warrant by Detective Price. Despite this, Defendant argues that two exceptions to the application of the good faith exception rule apply. First, with regard to Judge Kiniry's reliance on a deliberately or recklessly false affidavit, Defendant puts forward the same argument as above. The facts, however, indicate that the Detective Price did not act in a deliberate or reckless manner in preparing the affidavit of probable cause. Indeed, the affidavit indicates at length both the qualifications of Detective Price as an investigator of drug trafficking crimes and the circumstances surrounding the controlled drug buys from the Defendant. Thus, it is a reach to say that the affidavit contained deliberately or recklessly false information, thus overcoming the good faith exception. Rather, the veracity of Detective Price, the detailed nature of the affidavit, and the corroborating circumstances surrounding the criminal activity at issue here, all point towards a reliable affidavit of probable cause devoid of any deliberately or recklessly false statements. For these reasons, the good faith exception would still apply in this case.

Second, Defendant argues that the good faith exception should not apply here because of the reasons set forth above; namely, that the warrant was based on an affidavit that lacked sufficient probable cause. Again, the Court refers to its analysis above regarding the sufficiency of the

27

affidavit of probable cause. The affidavit supplied Judge Kiniry with a substantial basis to form the belief that evidence of controlled substances would be found at Mr. Harris' residence and in the mini-van because it detailed with sufficient clarity the circumstances surrounding the controlled buys from Defendant on three separate occasions. These buys occurred inside the Ash Street residence, immediately outside the residence, and inside the mini-van. While the Defendant asserts that the incident with the CI at the wall casts doubt over her reliability as a basis for the information contained in the affidavit, the Court notes that both the Defendant's prior criminal history and the repeated nature of the Defendant's criminal activity at issue in this specific case override any doubts that the CI's behavior may have produced. Thus, for these reasons, and those spelled out above, the Court finds that the affidavit sufficiently contained indicia of probable cause so as to render Detective Price's reliance on it objective reasonable and in good faith. Defendant's motion to suppress evidence would also be denied on this basis had the Court applied the good faith exception.

### 4.    Post-Arrest Statements

Lastly, Defendant asserts that his post-arrest statements made both orally and in writing violated his Fifth and Sixth Amendment rights because his waiver of these rights was not made voluntarily. (See Doc. No. 110 at 20-22). The Government disagrees and argues that the circumstances surrounding Mr. Harris' arrest and interrogation clearly establish that the waiver of his *Miranda* rights and his subsequent statements were made voluntarily to the interrogating officers.

Pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966), statements made by a defendant during a custodial interrogation must be suppressed unless the defendant was provided certain warnings and voluntarily, knowingly, and intelligently waived his or her right to have an attorney present during

the interrogation. *Id.* at 475. A valid *Miranda* waiver has two distinct components:

> First, the relinquishment of the right must be voluntary in the sense that it was the product of a free and deliberate choice rather than the result of intimidation, coercion, or deception. Second, the waiver must be made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension, may a court properly conclude that *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421 (1986). In turn, "[t]he use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles." *Lego v. Twomey,* 404 U.S. 477, 482–85 (1972). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). A statement is coerced, or involuntary, if the suspect's, "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante,* 499 U.S. 279, 288 (1991). When determining if a statement was freely and voluntarily given, courts must consider the totality of the circumstances, which includes both the characteristics of the person providing the statement and the details of the interrogation. *Id.* at 285–88. The surrounding circumstances can also include "the length of the interrogation, its location, its continuity, [and] the defendant's maturity, education, physical condition, and mental health." *See Connelly,* 479 U.S. at 167. It is the Government's burden of proving by a preponderance of the evidence that a statement was made voluntarily. *Lego v. Twomey,* 404 U.S. 477, 489 (1972).

In this case, Defendant first contends that the government cannot demonstrate that Mr. Harris had been given an opportunity to meet with an attorney. Defendant also avers that the waiver of his rights as supplied in writing and orally was not made voluntarily because he was intoxicated due to

his prior consumption of Oxycodone pills. The facts surrounding Mr. Harris' post-arrest interrogation, however, point towards a voluntary waiver of his *Miranda* rights. Specifically, before waiving his rights, the evidence establishes that Mr. Harris was fully advised of his rights both orally and in writing. Mr. Harris is a fifty-year old male adult with an assumed normal intelligence. Additionally, there was no evidence indicating that Mr. Harris was suffering from any type of impaired functions, either physically or psychologically. The interviewing officers also testified that it did not appear to either of them that Mr. Harris was under the influence of any type of substance or medication, and that the Defendant appeared completely alert and coherent during the interview.

As to the interview, it lasted only an hour, and there was no repeated or prolonged questioning of Mr. Harris during this time. There was also no evidence that the Defendant's will was overborn due to any coercive tactics employed by the interviewers. After acknowledgement of his rights, Mr. Harris voluntarily waived them during his interview by deciding to communicate with the interviewers. Indeed, his written consent acknowledging his rights indicated that he fully understood the right to remain silent and the right to consult an attorney prior to answering any questions. Even further, Mr. Harris' own written statement sets forth his consent to, "cooperate with the Drug Task Force with no problem with what we talk about." (Doc. No. 140 at 33). Thus, it is a stretch to say that Mr. Harris' statements made during the interview were not made voluntarily. The totality of the circumstances surrounding this interrogation, the characteristics of the Defendant at the time of this interview, Mr. Harris' awareness of his rights and the consequences of waiving them, and the lack of evidence of police coercion, intimidation, and deception all point to a waiver that was voluntary, intelligent, and knowing. For these reasons, the Court will deny Defendant's motion to suppress the post-arrest statements.

## V. CONCLUSION

For the above-stated reasons, the Court finds that Mr. Harris' Fourth, Fifth, and Sixth Amendment rights were not violated and will accordingly **DENY** Defendant's Motion to Produce Evidence (Doc. No. 104), Defendant's Motion for *Starks* Hearing, to Produce Material Witness, and to Suppress Audio Recordings (Doc. Nos. 105, 106), and Defendant's Motion to Suppress Evidence and Statements and Request for a *Franks* Hearing (Doc. No. 110). An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:10-cr-40 |
| | ) | |
| WILLIE B. HARRIS, SR., | ) | JUDGE KIM R. GIBSON |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW**, this 29th day of April 2013, upon consideration of Defendant Willie B. Harris'

Motion to Produce Evidence (Doc. No. 104), Defendant's Motion for *Starks* Hearing, to Produce

Material Witness, and to Suppress Audio Recordings (Doc. Nos. 105, 106), and Defendant's Motion

to Suppress Evidence and Statements and Request for a *Franks* Hearing (Doc. No. 110), and in

accordance with the Memorandum Opinion, it is **HEREBY ORDERED** that the motions are

**DENIED**.

BY THE COURT:

KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE